**FILED**
**CLERK**

9/25/2012 12:19 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
SCIENTON TECHNOLOGIES, INC., NI GROUP,
INC., SECURE-IT, INC.,

                    Plaintiffs,

                                          MEMORANDUM & ORDER

          -against-                       04-CV-2652(JS)(ETB)

COMPUTER ASSOCIATES INTERNATIONAL INC.,

                    Defendant.
---------------------------------------X
APPEARANCES
For Plaintiffs:     Dennis P. Stolle, Esq.
                    Matthew S. Barr, Esq.
                    Robert Dean MacGill, Esq.
                    Scott E. Murray, Esq.
                    Barnes & Thornburg LLP
                    11 South Meridian Street
                    Indianapolis, IN 46204

                    Panagiota Betty Tufariello, Esq.
                    The Law Offices of P.B. Tufariello, P.C.
                    25 Little Harbor Road
                    Mt. Sinai, NY 11766

                    Philip R. Forlenza, Esq.
                    Patterson, Belknap, Webb & Tyler LLP
                    1133 Avenue of the Americas
                    New York, NY 10036

For Defendant:      Jonathan N. Francis, Esq.
                    Michael D. Schissel, Esq.
                    Anthony D. Boccanfuso, Esq.
                    Erik Christopher Walsh, Esq.
                    Pamela Addison Miller, Esq.
                    Arnold & Porter LLP
                    399 Park Avenue
                    New York, NY 10022

                    Kevin Patrick Mulry, Esq.
                    John P. McEntee, Esq.
                    Farrell Fritz, P.C.
                    1320 RXR Plaza
                    Uniondale, NY 11556

SEYBERT, District Judge:

Presently before the Court are Defendant Computer Associates International Inc.'s ("CA" or "Defendant") motions for summary judgment and to strike the expert report of Professor Jennifer Bayuk--Plaintiffs Scienton Technologies, Inc., NI Group, Inc., and Secure-IT, Inc.'s (collectively, "Plaintiffs") expert--and to preclude her from testifying at trial. For the following reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Defendant's motion to preclude Professor Bayuk's testimony and to strike her report is GRANTED.

BACKGROUND[1]

The facts in this case are heavily disputed. The Court will only briefly discuss those facts that are relevant to the pending motions.

## I. Factual Background

### A. CA's Relationship to Plaintiffs

Plaintiffs' relationship with CA began in 1999, when Plaintiff Secure-IT, Inc. entered into a Vender Services Agreement ("VSA") with CA, whereby Secure-IT, acting as an outside vendor, would assist CA and CA's customers with the

---

[1] The following material facts are drawn from the parties' Local Civil Rule 56.1 Statements ("Contract 56.1 Stmt." or "Trade Secret 56.1 Stmt.") and their evidence in support. Any relevant factual disputes are noted.

installation and use of CA's software. (Trade Secret 56.1 ¶ 1.)
The VSA contained a New York choice-of-law provision and was
signed by representatives from both CA and Secure-IT. (Walsh
Decl. Ex. 2.) On June 5, 2000, Secure-IT merged with Defendant
NI Group, Inc., and the parties amended the VSA to reflect that
NI Group, rather than Secure-IT, would be the vendor going
forward. (Lorenzo Decl. Ex. 1-2.) Plaintiffs prepared a
revised VSA (the "Revised VSA"), dated June 30, 2000, reflecting
this change. (Lorenzo Decl. Ex. 3.) The Revised VSA also
contained a New York choice-of-law provision. It was signed by
a representative from NI Group, but it was never signed by
anyone from CA. (Lorenzo Decl. Ex. 3.) On November 29, 2000,
Scienton Technologies, Inc. became the successor-in-interest to
NI Group. (Lorenzo Decl. Ex. 123, Zivic Decl. ¶ 3.)

   B.   Plaintiffs' Enterprise Security System

        In the summer of 2000, Plaintiffs approached CA with
the idea of combining existing and unrelated CA products,
including Neugents, AION, Jasmine ii portal, and its line of
eTrust products,[2] with third-party programs to create a new
system to manage both digital and physical security. (Trade
Secret 56.1 Stmt. ¶ 2; Trade Secret 56.1 Counterstmt. ¶ 2.) To

---

[2] CA acquired many of these products through its acquisition of
Platinum Technologies, Inc. in 1999. (Trade Secret 56.1
Counterstmt. ¶ 2.) Predrag Zivic, one of Scienton Technology,
Inc.'s founders, was a former security consultant for Platinum.
(Walsh Decl. Ex. 7, Zivic Dep. 212.)

facilitate in the development of this new integrated security system (the "Enterprise Security System" or "ESS"), Plaintiffs and CA entered into a Mutual Nondisclosure Agreement ("MNDA") under which Plaintiffs would have access to CA's computer software programs and CA would have access to information related to Plaintiffs' development of the ESS. (Walsh Decl. Ex. 5.) The parties agreed not to share the other's confidential information without prior written consent and to return and/or destroy any such confidential information upon written request. (Walsh Decl. Ex. 5, MNDA ¶¶ 4-5.) The MNDA was signed by representatives of both parties. (Walsh Decl. Ex. 5, MNDA at 3.)

Pursuant to the terms of the MNDA, CA provided Plaintiffs with copies of certain CA programs, including eTrust Audit, Neugents, and AION, for the purpose of developing the ESS. (Trade Secret 56.1 Stmt. ¶ 4; Trade Secret 56.1 Counterstmt. ¶ 4.) Plaintiffs assert that they were successful in developing the ESS--a program that combined previously unrelated computer programs to create a security solution that gathers both physical and digital security-related events, analyzes that data in real-time to identify anomalies/conditions for potential action-taking, and organizes and presents the results of that data. (Trade Secret 56.1 Stmt. ¶ 5.) According to Plaintiffs, at that time, there was no similar program on the

market capable of performing the full functionality of their ESS. (Trade Secret 56.1 Counterstmt. ¶ 17.) Although Plaintiffs never provided CA with a copy of the ESS source code (Contract 56.1 Stmt. ¶ 6), Plaintiffs assert that they frequently updated CA on the status of its development and shared with CA,[3] among other things, a PowerPoint presentation explaining the general architecture of their ESS, listing the different CA and third-party programs incorporated therein, and describing the product's functional capabilities. (Lorenzo Decl. Ex. 7.)

On June 25, 2001, CA terminated the VSA[4] and, in accordance with the terms of the MNDA, requested that Plaintiffs return all copies of CA software and documents in their possession. (Trade Secret 56.1 Stmt. ¶ 7.) In addition to returning all of CA's software and related documentation, Plaintiffs also destroyed all of their work product, including the source code, related to the ESS, because the program contained CA's confidential material. (Trade Secret 56.1 Stmt. ¶ 8.)

---

[3] Plaintiffs assert that this information was shared with the following CA employees and possibly others: Julia Ruslys, Michael LaTorraca, Nigel Collins, Piers McMahon, Eric Maurice, J.P. Corriveau, Joanne Moretti, Anthony Wright, Terry Pacheco, Roger Fenyo, Simon Perry, and Russ Artzt. (Contract 56.1 Counterstmt. ¶ 6.)

[4] It is unclear whether CA terminated the VSA, the Revised VSA, or both. (See Contract 56.1 Counterstmt. ¶ 7.)

C.   The CIBC Contracts

One of CA's customers is the Canadian Imperial Bank of Commerce ("CIBC"). (Contract 56.1 Stmt. ¶ 2.) CA's relationship with CIBC dates back to 1996 when they entered into an enterprise license agreement (the "1996 ELA"). (Contract 56.1 Stmt. ¶ 2.) CA and CIBC entered into a revised ELA in 1998 (the "1998 ELA") (Contract 56.1 Stmt. ¶ 3),[5] and, in or around July 2000, CIBC and CA began discussing the terms of a new ELA (the "2001 ELA").[6] (Contract 56.1 Stmt. ¶ 5; Contract 56.1 Counterstmt. ¶¶ 4-5.)

On November 15, 2000, CIBC issued a request for proposal ("RFP"). (Walsh Decl. Ex. 28.) The RFP stated that the "Project Objective" was:

> **To:** implement a security architecture which will grant access to the electronic data assets of CIBC based on roles based permissions
>
> **In a way that:**
> ✓ Reduction of multiple security infrastructures into a single, manageable security solution for the enterprise.

_____

[5] The terms of both the 1996 and 1998 ELAs are disputed. (Contract 56.1 Counterstmt. ¶ 3.)

[6] CIBC was in the process of spinning off its insurance business, which, according to the terms of the 1998 ELA, would have required CIBC to pay CA a divestiture fee. CA used the divestiture fee as leverage to renegotiate the terms of the 1998 ELA. (Contract 56.1 Stmt. ¶¶ 4-5; Contract 56.1 Counterstmt. ¶ 4.)

    ✓ Provides a single user/customer interface and single sign-on for applications.

    ✓ Facilitates CIBC's ability to move in forward quickly in the 'e-commerce' arena by providing a published, common security architecture for rapid application development.

    ✓ Allows for the flexibility of delegated management within the organization to allow business units to administer their security "domain"

**So that:** security becomes a pervasive infrastructure, incorporated into every aspect of life at CIBC yet remains invisible to ordinary users and customers

(Walsh Decl. Ex. 28, RFP at 4.) The RFP stated that its "primary goal" was "to find a solutions vendor who [could] work with CIBC to realize [its] short-term and long-term vision for a world class security infrastructure." (Walsh Decl. Ex. 28, RFP at 4.)

On or around November 29, 2000, Plaintiffs met with Joanne Moretti, a Senior Vice President for CA, in CA's Ontario office. (Contract 56.1 Stmt. ¶ 13; Barr Decl. Ex. 1, Zivic Supp. Decl. ¶ 15.) What occurred at this meeting is heavily disputed. Defendant asserts that Ms. Moretti met with Plaintiffs regarding CIBC's RFP because Plaintiffs had experience with CA's single sign-on ("SSO") product. (Contract 56.1 Stmt. ¶ 13.) According to Defendant, Plaintiffs were to work with CA in pitching CA's SSO software to CIBC in response to the RFP. Plaintiffs, on the other hand, assert that Ms.

Moretti met with Plaintiffs to engage them more generally in the "CIBC Sales Effort." (Contract 56.1 Counterstmt. ¶ 13.) According to Plaintiffs, Ms. Moretti told them that CIBC had a negative impression of CA which potentially jeopardized CIBC's signing the 2001 ELA. (Contract 56.1 Counterstmt. ¶¶ 2, 13; Barr Decl. Ex. 1, Zivic Supp. Decl. ¶ 15.) Thus, Ms. Moretti made the following offer to Plaintiffs:

> In exchange for partnering with CA to design and pitch a security solution for CIBC featuring Scienton's expertise and services, Scienton would receive (1) 10% of any software sales to CIBC and (2) subcontracts for providing implementation and support services.

(Barr Decl. Ex. 1, Zivic Supp. Decl. ¶ 16.) Plaintiffs assert that Ms. Moretti stated that the agreement would eventually be memorialized in a written teaming agreement but that CA intended to be bound by the oral agreement. (Barr Decl. Ex. 1, Zivic Supp. Decl. ¶ 16.)

Plaintiffs went to work immediately. On December 15 and 19, 2000, they participated in two presentations to CIBC regarding the RFP. (Contract 56.1 Stmt. ¶ 15.) Thereafter, Plaintiffs requested a written agreement reflecting the terms discussed at the November 29, 2000 meeting with Ms. Moretti. (Contract 56.1 Stmt. ¶ 16.) CA sent Plaintiffs a written

Teaming Agreement on January 16, 2001.[7] (Lorenzo Decl. Ex. 12.) The Agreement stated that "CIBC [was] expected to solicit bids and award a prime contract for" the "Program." (Lorenzo Decl. Ex. 12 at S0000175.) It provided that CA and Plaintiffs would work together to "secure a prime contract or contracts for the Program." (Lorenzo Decl. Ex. 12 at S0000180.) If CA was awarded the prime contract, Plaintiffs would be paid "10% of the value of CA software product sale at CIBC," and would be awarded "[t]he contract for services to implement and support the CA product at CIBC." (Lorenzo Decl. Ex. 12 at S0000179). The section of the Teaming Agreement that was supposed to include a definition of the "Program" was left blank (Lorenzo Decl. Ex. 12 at S0000175) and "prime contract" was also left undefined. Plaintiffs assert that the "prime contract" was the 2001 ELA; Defendant asserts that it was a new contract related to the RFP. The Teaming Agreement also contained a New York choice-of-law provision. (Lorenzo Decl. Ex. 12 ¶ 11.) It was signed by Mr. Zivic on behalf of Plaintiffs on January 18, 2001 but was never signed by CA. (Lorenzo Decl. Ex. 12 at S0000178.)

CIBC ultimately did not purchase CA's SSO product. (Contract 56.1 Stmt. ¶ 17.) CIBC did, however, enter into the 2001 ELA with CA on March 30, 2001. (Lorenzo Decl. Ex. 14.)

---

[7] The parties dispute whether this was a draft or the final agreement. (Contract 56.1 Stmt. ¶ 22; Contract Counterstmt. ¶ 16.)

Pursuant to the terms of the 2001 ELA, CA received $68 million. (Lorenzo Decl. Ex. 14, 2001 ELA at 2-3.) CA did not pay Plaintiffs ten percent of the value of the 2001 ELA nor did it award Plaintiffs a subcontract to implement CA's software at CIBC and provide continuing support services.

> D. CA's Release of eTrust Security Command Center and eTrust 20/20

In 2003, CA released two programs, the eTrust Security Command Center ("SCC") and eTrust 20/20 ("20/20"). (Trade Secret 56.1 Stmt. ¶ 9.) Plaintiffs assert that these products incorporate key components of their ESS. (See Lawrence Decl. Ex. 96, Myers' Expert Rpt. 44 (describing the "striking similarity in the fundamental target use, purpose, and function set of The Scienton Enterprise Security Solution and Security Command Center"); id. at 25 (finding that there is a "significant amount of overlap" between Scienton's ESS and 20/20).)

## II. Procedural Background

Plaintiffs commenced this action on June 25, 2004. (Docket Entry 1.) On July 20, 2006, Plaintiffs, on consent, filed a Second Amended Complaint asserting the following claims: (1) breach of the Teaming Agreement, (2) quasi-contract related to the Teaming Agreement, (3) misappropriation of an idea, (4)

misappropriation of trade secrets, (5) breach of the MNDA, and (6) unfair competition.[8]  The parties proceeded with discovery.

On November 2, 2005, the parties appeared before Magistrate Judge Michael L. Orenstein for a hearing on CA's motion "for an order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure requiring Plaintiffs, as a condition of proceeding with trade secret discovery, to identify with adequate specificity the trade secrets they claim were misappropriated." (Docket Entry 41.)  Plaintiffs had requested that CA produce the source code of 20/20 and SCC, and CA refused.  Judge Orenstein ordered CA to provide Plaintiffs with working copies of 20/20 and SCC (rather than the source code) and ordered Plaintiffs to disclose what aspects of their ESS, specifically, they claim CA incorporated into those products. (Walsh Decl. Ex. 48, Nov. 2, 2005 Tr. 42.)

In response to Judge Orenstein's order, Plaintiffs provided CA with a letter from counsel providing a "summary" of the "concepts that [Plaintiffs] say[] [were] stolen." (Walsh Decl. Ex. 49, Jan. 18, 2006 Tr. 25, 27.)  The parties again appeared before Judge Orenstein on January 18, 2006 to discuss

---

[8] The Second Amended Complaint also asserted claims related to a contract CA entered into with BCE Emergis which were voluntarily dismissed on January 19, 2012 (Docket Entry 303) and claims for breach of the implied duty of good faith and fair dealing and breach of fiduciary duty which were dismissed by this Court for failure to state a claim on March 24, 2008 (Docket Entry 190).

the sufficiency of Plaintiffs' response. Judge Orenstein held that counsel's letter was "not what th[e] Court ordered in November. [The] Court ordered specificity, not [Plaintiffs'] interpretation of what [they] felt was enough." (Walsh Decl. Ex. 49, Jan. 18, 2006 Tr. 28.) Judge Orenstein concluded that counsel's letter was not enough and again ordered Plaintiffs to provide a more detailed explanation of their alleged trade secret to CA. (Walsh Decl. Ex. 49, Jan. 18, 2006 Tr. 33.)

On March 6, 2006, Plaintiffs produced their "Trade Secret Disclosure"--a 41-page document describing their alleged trade secret as follows:

> a unique and previously unknown collection, combination, refinement and enhancement of a number of previously unrelated computer programs and software functionalities to create an 'enterprise security solution' encompassing physical and digital security ('Scienton's ESS') and having far greater capabilities than any prior single security system or pre-existing combination of security systems.

(Walsh Decl. Ex. 6, Trade Secret Disclosure at 1.)

Judge Orenstein questioned the sufficiency of Plaintiffs' Trade Secret Disclosure at a hearing on March 16, 2006 because it did not explain "how th[e computer programs] function together." (Walsh Decl. Ex. 50, Mar. 16, 2006 Tr. 8.) Counsel clarified that Plaintiffs' trade secret is "not the how [sic] you particular[ly] wire one program to the other . . . ,

it's the actual combination of programs 1, 4, and 6 to perform a particular function." (Walsh Decl. Ex. 50, Mar. 16, 2006 Tr. 10.) Judge Orenstein ultimately found that this Trade Secret Disclosure was sufficient for discovery to proceed.

On February 27, 2012, Defendant filed two motions: one for summary judgment and the other to strike the report of Plaintiffs' expert, Professor Bayuk, and preclude her testimony at trial. (Docket Entries 306-07.) These motions are presently pending before the Court.

DISCUSSION

The Court will discuss the merits of Defendant's motions for summary judgment and to strike/preclude Plaintiffs' expert in that order.

I.    Motion for Summary Judgment

Defendant segregates Plaintiffs' claims into two categories: the "contract claims" and the "trade secret" claims. After briefly discussing the applicable standard of review on a motion for summary judgment, the Court will address each category of claims separately.

A.    Standard of Review

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re

Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (citing

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91

L. Ed. 2d 265 (1986)); see also Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"In assessing the record to determine whether there is a genuine

issue to be tried as to any material fact, the court is required

to resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment

is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.

1997).

    "The burden of showing the absence of any genuine

dispute as to a material fact rests on the party seeking summary

judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S.

144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine

factual issue exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson,

477 U.S. at 248. To defeat summary judgment, "the non-movant

must 'set forth specific facts showing that there is a genuine

issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41

(2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "Mere

speculation or conjecture as to the true nature of the facts"

will not overcome a motion for summary judgment. Knight v. U.S.

Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams

v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory

allegations or denials will not suffice."); <u>Weinstock</u>, 224 F.3d
at 41 ("[U]nsupported allegations do not create a material issue
of fact." (citing <u>Goenaga v. March of Dimes Birth Defects
Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995)).

    B.  <u>Contract Claims</u>

       Plaintiffs' contract claims consist of: (1) a breach
of contract claim and (2) an equitable claim for quasi-contract.

       1.  <u>Breach of Contract Claim</u>

       Plaintiffs assert that CA breached an agreement to pay
Plaintiffs ten percent of the 2001 ELA with CIBC and to award
Plaintiffs a subcontract to implement and support the software
at CIBC.    Plaintiffs do not assert that the unsigned January
2001 Teaming Agreement containing these terms[9] is a valid and
enforceable contract.    Rather, Plaintiffs argue that the Teaming
Agreement was an attempt at memorializing a valid and
enforceable oral agreement entered into by the parties in
November 2001.    Defendant argues that there was no binding oral

---

[9] As the Court explained above, <u>see</u> <u>supra</u> page 9, the unsigned
Teaming Agreement did not specifically state that Plaintiffs
were to be awarded ten percent of the 2001 ELA.    Rather, it
stated that if CA was awarded the "prime contract" by CIBC,
Plaintiffs would be entitled to "10% of the value of CA software
product sale at CIBC" as well as a subcontract to implement and
support CA's software at CIBC.    (Lawrence Decl. Ex. 12.)    The
parties dispute whether the "prime contract" was the 2001 ELA or
a new contract related to the RFP.    (<u>See</u> Contract 56.1 Stmt. ¶
17.)    Although this is a disputed fact, it is not material to
the Court's analysis.    Thus, for the purposes of this motion,
the Court will assume that the "prime contract" was the 2001
ELA.

agreement, or, in the alternative, that such oral agreement is barred by New York's Statute of Frauds.

a.  Oral Agreement

As a threshold matter, the Court must determine whether New York or Ontario law governs Plaintiffs' contract claims.  A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); Bogio v. Coca Cola Co., 675 F.3d 163, 169 (2d Cir. 2012).  "Under New York choice-of-law rules, '[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'"  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) (alteration in original) (quoting Wall v. CSX Transp., Inc., 471 F.3d 410, 415 (2d Cir. 2006)).  If no actual conflict exists and New York is one of the jurisdictions involved, the court may simply apply New York law.  See id.

Here, both parties have applied New York law to the issue of contract formation (see Pls. Summ. J. Opp. 9 n.4 (quoting Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 322 (2d Cir. 1997)); Def. Summ. J. Mot. 10 (quoting Cent. Fed. Sav., F.S.B. v. Nat'l Westminster Bank, 176 A.D.2d 131, 132, 574

N.Y.S.2d 18, 19 (1st Dep't))),[10] and the law in New York and Ontario do not appear to conflict, compare Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir. 2009) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."), with Celerity Q, Ltd. v. CSDC Sys., Inc., No. C2-09-CV-0377, 2010 WL 1494988, at *3 (S.D. Ohio Apr. 14, 2010) ("Under Ontario law, a contract is formed when the parties have agreed on the essential terms and intend to be bound."). Therefore, the Court will apply New York law.

The Court must consider four factors in determining whether the parties entered into an oral agreement:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 549 (2d Cir. 1998) (quoting Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1986)) (internal quotation marks omitted). However, in most instances, "[w]hether a contracting party intends to be bound in the absence of a writing is a

---

[10] And neither party has supplied the Court with Ontario law governing contract formation.

question of fact to be presented for resolution to the factfinder at trial." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 575 (2d Cir. 1993) (stating that summary judgment is "an improper procedural vehicle for determining the parties' intent not to be bound in the absence of written agreements--even in cases where evidence strongly suggests the contrary"). Summary judgment is proper only when the evidence "is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004) (internal quotation marks and citation omitted). Here, the evidence is not so one-sided (compare Lorenzo Decl. Ex. 12 § 15 (draft Teaming Agreement stating that "[t]his Agreement . . . shall supersede and cancel all previous oral or written negotiations, agreements, commitments, and writings between the parties relating thereto" (emphasis added)), and Barr Decl. Ex. 1 ¶ 16 (Zivic stating that Moretti told him at the November 2000 meeting that a written teaming agreement was "merely a formality"), with Walsh Decl. Ex. 43 (emails from Zivic dated February 2001 stating that "[a]ccording to the teaming agreement (once we get it signed), we are going to help you with our resources . . . ."); therefore, whether the parties' intended to

be bound at the November 2000 meeting is a material question of fact to be decided by the factfinder at trial.[11]

### b.  Statute of Frauds

Defendant argues that any oral agreement is barred by New York's statute of frauds because (i) it concerns compensation for consummating a business transaction under N.Y. GEN OGLIB. LAW § 5-701(a)(10), and (ii) it could not by its terms be performed within one year under N.Y. GEN OGLIB. LAW § 5-701(a)(1).  Plaintiffs, in addition to arguing that these sections are inapplicable, for the first time in the course of this protracted litigation assert that Ontario's statute of frauds--which does not have provisions analogous to the New York provisions cited by Defendant and thus would not bar the alleged oral agreement--governs the parties' oral contract.

### i.  Choice of Law

Because an actual conflict exists between New York and Ontario law with respect to the statute of frauds, the Court must engage in a choice-of-law analysis.  New York conflicts law directs that "[t]he law of the jurisdiction having the greatest

_____

[11] The Court notes that the other factors do not undoubtedly establish that CA did not intend to be bound by the oral agreement.  For example, there is evidence in the record that Plaintiffs partially performed under the contract (see Contract 56.1 Stmt. ¶ 15), and that, at least between these parties, prior oral agreements were not committed to writing (see Lorenzo Decl. Ex. 104, Ruslys Dep. 59; Lorenzo Decl. Ex. 3).  Although it is a close call, the Court must draw all reasonable inferences in favor of Plaintiffs.

interest in the litigation should apply, provided that that jurisdiction possessed sufficient contacts with the litigation." Fort Howard Paper Co. v. William D. Witter, Inc., 787 F.2d 784, 790 (2d Cir. 1986); see also Intercont'l Planning v. Daystrom, Inc., 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969) ("[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." (citing Miller v. Miller, 22 N.Y.2d 12, 15-16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968)).[12] The Court finds that New York law governs.

First, New York's policies underlying its statute of frauds favor the application of New York law to Plaintiffs' contract claims. The New York Court of Appeals has held that New York has a paramount interest in the application of its statute of frauds to prevent perjury upon its courts.

_____

[12] While New York courts typically apply a "center of gravity" or "grouping of contacts" approach to choice-of-law questions in contract cases, "there are of course instances where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered." In re Allstate Ins. Co. & Stolarz, 81 N.Y.2d 219, 226, 613 N.E.2d 936, 939, 597 N.Y.S.2d 904, 907 (1993). Contract disputes involving New York's statute of frauds are one such example. Id. (citing Intercont'l Planning, 24 N.Y.2d at 382-85, 248 N.E.2d at 582-84, 300 N.Y.S.2d at 825-28).

<u>Intercont'l Planning</u>, 24 N.Y.2d at 384-85, 248 N.E.2d at 583, 300 N.Y.S.2d at 827 (stating that New York's statute of frauds "protect[s] principals in business transactions from unfounded claims and thereby encourage[s] use of New York as a national and international business center"); <u>see also</u> <u>Fort Howard</u>, 787 F.2d at 791; <u>Sugerman v. MCY Music World, Inc.</u>, 158 F. Supp. 2d 316, 322-23 (S.D.N.Y. 2001); <u>Merex A.G. v. Fairchild Weston Sys., Inc.</u>, 810 F. Supp. 1356, 1366 (S.D.N.Y. 1993); <u>William J. Conlon & Sons, Inc. v. Wanamaker</u>, 583 F. Supp. 212, 216 (E.D.N.Y. 1984).[13] While Ontario, whose statute of frauds is inapplicable to the oral contract at issue, may have an interest in upholding the reasonable expectations of contracting parties,[14] courts in this Circuit have held that such an interest is inferior to New York's. <u>See</u> <u>Prescient Acquisition Grp., Inc. v. Perfect Circle Entm't, Inc.</u>, No. 05-CV-6298, 2006 WL 2136293, at *8 (S.D.N.Y. July 31, 2006) (noting that "California's interest in protecting the reasonable expectations of its citizens is 'much less apparent' than New York's clear interest in protecting against fraudulent claims" (citation

---

[13] The Court notes that while <u>Intercontinental Planning</u> and the other cases cited above discussed New York's interest with respect to Section 5-701(a)(10) only, the Court of Appeals' analysis has been extended to Section 5-701(a)(1) as well. <u>See</u> <u>O'Keefe v. Bry</u>, 456 F. Supp. 822, 827-28 (S.D.N.Y. 1978).

[14] The Court is speculating as Plaintiffs have not provided the Court with any legal authority on the issue.

omitted)); <u>Merex</u>, 810 F. Supp. at 1366 ("New York's policy of protecting its residents from unfounded finder's fee claims is clear whereas Germany's interest in protecting the reasonable expectations of its residents is much less apparent."); <u>cf.</u> <u>O'Keefe v. Bry</u>, 456 F. Supp. 822, 828 n.8 (S.D.N.Y. 1978) ("Statutes of frauds also serve the general purpose of protecting the integrity of the judicial process in the courts of the enacting state. In this regard, only the forum state, New York, has an interest in applying its statutes."); <u>William J. Conlon & Sons</u>, 583 F. Supp. at 214 (similar).

<u>Second</u>, New York has sufficient contacts with the instant dispute to give it a substantial interest in applying its policy. Plaintiffs filed this action in New York, CA is headquartered in New York (and thus a New York resident), and the unsigned Teaming Agreement contains a New York choice-of-law provision.[15] Accordingly, the Court finds that New York's statute of frauds applies to this alleged oral agreement.

---

[15] Plaintiffs argue that because Ontario has the most significant contacts with this dispute, Ontario law governs. The Court agrees that Ontario has more significant contacts with this action than New York, as the alleged contract at issue was negotiated and entered into in Ontario. However, a state need not have the "most significant" contacts with the dispute in order to have the greatest interest:

> To ensure the validity of an interest in the outcome of a dispute, it is necessary that a State have <u>some</u> contacts with the dispute. However, to insist upon a State having the

## ii.  New York's Statute of Frauds

CA argues that two provisions of New York's statute of frauds bars the oral contract at issue here:  N.Y. GEN OGLIB. LAW § 5-701(a)(10) and N.Y. GEN OGLIB. LAW § 5-701(a)(1).  Because the Court finds that Section 5-701(a)(10) applies here, it will not address the applicability of Section 5-701(a)(1).

Section 5-701(a)(10) provides that "a contract to pay compensation for services rendered in negotiating . . . a business opportunity" is void unless it is in a writing signed by the party to be charged.  The parties do not dispute that the 2001 ELA was a "business opportunity;" rather, Plaintiffs argue that Section 5-701(a)(10) does not apply because their "role was much larger" than "negotiat[ing] a deal with CIBC or otherwise act[ing] as an intermediary."  (Pls. Summ. J. Opp. 11.)  While the Court agrees that Plaintiffs were "more than just a mere intermediary" (Pls. Summ. J. Opp. 10), their actions nonetheless fall within the scope of Section 5-701(a)(10).

"Negotiating" is statutorily defined to include "procuring an introduction to a party to a transaction" and

---

most significant contacts in order to have an interest would turn the interest analysis into the most significant contacts method of conflicts of law analysis, a method rejected by the New York Court of Appeals in <u>Daystrom</u>.

<u>William J. Conlon & Sons</u>, 583 F. Supp. at 216.

"assisting in the negotiating or consummation of a transaction,"
N.Y. Gen Oglib. Law § 5-701(a)(10), and the New York Court of
Appeals has held that this definition includes providing
"connections," "ability," "knowledge," "'know-how' or 'know
who,' in bringing about between principals an enterprise of some
complexity or an acquisition of a significant interest in an
enterprise," Freedman v. Chem. Constr. Corp., 43 N.Y.2d 260,
267, 372 N.E.2d 12, 16-17, 401 N.Y.S.2d 176, 181 (1977); see
also Snyder v. Bronfman, 13 N.Y.3d 504, 508-09, 921 N.E.2d 567,
569-70, 893 N.Y.S.2d 800, 802-03 (2009).

District courts in this Circuit have interpreted this
definition of "negotiating" broadly.  For example, in Gutkowski
v. Steinbrenner, 680 F. Supp. 2d 602 (S.D.N.Y. 2010), Southern
District Judge Richard J. Sullivan held that Section 5-
701(a)(10) applied where the plaintiff sought compensation for
(1) identifying and analyzing a business opportunity--i.e., the
idea of creating what ultimately became the Yankees
Entertainment and Sports ("YES") Network--and presenting such
opportunity to George Steinbrenner III, (2) "identifying and
analyzing potential business partners" for the Yankees in this
venture, and (3) substantially contributing to the eventual
formation of YES by "formulat[ing] detailed business plans
covering each and every aspect of YES'[s] implementation and
management[,] . . . cultivat[ing] contacts[,] and develop[ing]

24

viability schemes and options." Id. at 613 (internal quotation marks and citation omitted). Judge Sullivan held that the plaintiff's activities fell "squarely within the Statute of Frauds." Id. (internal quotation marks and citation omitted).

Similarly, in Zeising v. Kelly, 152 F. Supp. 2d 335 (S.D.N.Y. 2001), Southern District Judge Richard Casey held that Section 5-701(a)(10) barred the breach of contract claims of a plaintiff seeking compensation for assisting the defendants in establishing a new company by:

> (1) putting together a financial and business plan for [the defendants] which would enable them to take the broadly defined ideas with which they were working and translate them into a feasible presentation which would attract legitimate institutional investors and strategic partners for [the defendants]; (2) calling upon his considerable contacts within the financial services industry to make them generally aware of [the defendants]; and (3) preparing and making detailed presentations to those representatives of institutions who expressed interest in and who had the financial wherewithal to participate in [the new company] either as investors or as strategic partners.

Id. at 343. Judge Casey held that the alleged contract "involve[d] no more than an agreement to pay compensation for [the p]laintiff's services related to the negotiation of a

business opportunity, as such term is defined in the Statute of Frauds." Id. at 344.[16]

Here, Plaintiffs purport to have been engaged by CA to "design and pitch an end-to-end security solution" for CIBC, and it is undisputed that Plaintiffs substantially participated in developing a proposal for CA in response to CIBC's RFP (Contract 56.1 Stmt. ¶ 14) and presenting such proposal to CIBC (Contract 56.1 Stmt. ¶ 15). In other words, similar to the plaintiffs in Gutkowski and Zeising, Plaintiffs "analyz[ed] a business opportunity"--i.e., CIBC's RFP--and were a "major contributor" in CIBC's signing the 2001 ELA.[17] Gutkowski, 680 F. Supp. 2d at 613. Thus, Plaintiffs' "'claim is precisely the kind the statute of frauds describes,'" id. (quoting Snyder, 13 N.Y.3d at 509, 921 N.E.2d at 569, 893 N.Y.S.2d at 802), and, accordingly, CA is entitled to summary judgment on Plaintiffs' breach of contract claim.

2.  Quasi-Contract Claim

In the alternative, Plaintiffs argue that they are entitled to recover under a quasi-contract theory of liability.

_____

[16] These cases are not outliers. See also, e.g., Transition Inv., Inc. v. Allen O. Dragge, Jr. Family Trust, No. 11-CV-4775, 2011 WL 5865149, at *8-9 (S.D.N.Y. Nov. 21, 2011); Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd., 675 F. Supp. 122, 128 (S.D.N.Y. 1987).

[17] Again, the Court emphasizes that whether Plaintiffs had any involvement in the 2001 ELA is disputed by CA. See supra page 9.

However, "New York law is equally clear in holding that '[q]uasi-contract claims are barred by . . . § 5-701(a)(10).'" Id. (quoting Sugerman, 158 F. Supp. 2d at 326); accord N.Y. GEN. OBLIG. LAW § 5-701(a)(10) ("This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . ."). Accordingly, the Court grants CA's motion with respect to this claim as well.

### C. Trade Secret Claims

Plaintiffs' trade secret claims consist of claims for: (1) misappropriation of trade secrets, (2) misappropriation of an idea, (3) breach of the MNDA, and (4) unfair competition. Before addressing the merits of Defendant's arguments with respect to the trade secret claims, the Court must first determine what law governs these tort claims. Cf. Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1540 (2d Cir. 1997) ("It is possible that, under New York's choice of law rules, the law of different jurisdictions can apply to the tort claims and the contract claims in a given suit."). Here, as both parties apply New York law without conducting a choice-of-law analysis and neither party has provided the Court with Canadian law, the Court assumes that the respective laws are not in conflict. Cf. Frink Am., Inc. v. Champion Rd. Mach. Ltd., 48 F. Supp. 2d 198, 205 (N.D.N.Y. 1999) (stating that Canadian law governing misappropriation of trade secrets is "similar" to New

York's law).  Accordingly, the Court applies New York law to its analysis.  See Licci, 672 F.3d at 157 ("If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law.").

### 1.   Misappropriation of Trade Secrets

"A plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990) (internal quotation marks and citation omitted); accord Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009).  New York law defines a trade secret as "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1012, 604 N.Y.S.2d 912, 917 (1993) (quoting RESTATEMENT (FIRST) OF TORTS § 757 cmt. b); accord Integrated Cash Mgmt., 920 F.2d at 173.

Here, Plaintiffs describe their purported trade secret as "a unique and previously unknown collection, combination, refinement and enhancement of a number of previously unrelated computer programs and software functionalities to create an

'enterprise security solution' encompassing physical and digital security . . . ." (Walsh Decl. Ex. 6 ("Trade Secret Disclosure") at 1.) Defendant argues, inter alia, that this does not constitute a trade secret. The Court agrees.

Although courts have held that such a "unique combination" of otherwise publicly available computer programs may constitute a trade secret, see Integrated Cash Mgmt., 920 F.2d at 174 ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." (internal quotation marks and citation omitted)); see also LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002); Q-Co Indus., Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y. 1985), whether a particular "unique combination" is, in fact, a trade secret depends on whether the information was secret, see LinkCo, 230 F. Supp. 2d at 498 ("'[T]he most important consideration [is] whether the information was secret.'" (quoting Lehman v. Dow Jones & Co., 783 F.2d 285, 298 (2d Cir. 1986))).

"Although secrecy is a question of fact, courts have held that there can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or product is placed on the market." Id. (collecting cases)

(internal quotation marks and citation omitted). For example, in LinkCo, Judge Shira A. Scheindlin in the Southern District held that the design or "architecture" of a computer program (as opposed to its source code) did not constitute a trade secret because "once the combination of LinkCo's elements is seen by the public, the system's architecture will become obvious and easily duplicated." Id. at 499 (stating that "[o]nce the 26-element software architecture system is reduced to a product, its architecture can never remain a secret"); see also, e.g., Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1177 (2d Cir. 1993) (finding that a hotel-room design concept was not a trade secret because once the hotel room is "built, marketed, and occupied, the features of the room would necessarily be disclosed publicly" (citations omitted)), abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368 (2d Cir. 2000). On the other hand, courts have held that the intricacies of how different elements will interact with one another--i.e., the "way in which [the] various components fit together as building blocks in order to form a unique whole," Integrated Cash Mgmt., 920 F.2d at 174, or a program's "source code," Q-Co Indus., 625 F. Supp. at 617--do constitute a trade secret so long as such information "is not easily copied or ascertainable by inspection of the program," LinkCo, 230 F. Supp. at 499 (collecting cases).

In the present case, Plaintiffs' purported trade secret is not the source code for the ESS or even the technical details regarding how the different programs will interact with one another within the ESS.[18] Rather, it is the "idea" to create a security solution that includes both digital and physical security and the "identif[ication]" of "combin[ations of] unrelated computer programs and software functionalities" that will achieve that end. (Pls. Summ. J. Opp. 18; see also Walsh Decl. Ex. 48, Nov. 2, 2005 Tr. 27 ("It's not the source code that's at issue. It's the overall unique concept of combining all of these elements . . . ." (emphasis added)).) Similar to the program in LinkCo, however, once the ESS hit the market, this information would have become obvious and easy to ascertain. In fact, Plaintiffs prepared their Trade Secret Disclosure by reviewing the publicly available copies of 20/20 and SCC which revealed to them the specific combinations of software functionalities that were incorporated into those products. Accordingly, the Court finds, as a matter of law,

---

[18] Plaintiffs assert that their Trade Secret Disclosure does explain the details of how the different programs would work together and cite to the charts on pages 22-40. However, these charts merely provide the ESS's general architecture (in fact, they are labeled "architecture schematics"), which is exactly what the court in LinkCo held was insufficient to constitute a trade secret. Further, counsel previously stated that Plaintiffs' trade secret is "not the how [sic] you particular[ly] wire one program to the other." (Walsh Decl. Ex. 50, Mar. 16, 2006 Tr. 10 (emphasis added).)

that Plaintiffs' "concept" is not entitled to trade secret protection, and summary judgment on this claim is granted in favor of Defendant.

    2.    Misappropriation of an Idea

    "New York recognizes the tort of idea misappropriation when the plaintiff establishes that (1) his allegedly misappropriated ideas were novel and concrete and (2) there existed a legal relationship between the parties." Alexander v. Murdoch, No. 10-CV-5613, 2011 WL 2802899, at *18 (S.D.N.Y. May 27, 2011); see also Hogan v. DC Comics, 48 F. Supp. 2d 298, 314 (S.D.N.Y. 1999).    Such a cause of action is separate and distinct from a misappropriation of a trade secret claim.    See Lehman, 783 F.2d at 299 ("A cause of action may arise with respect to information that does not qualify as a trade secret if the information is disclosed in confidence and later used in a manner that breaches that confidence.").

    Defendant argues in its moving brief that "the misappropriation of an idea claim fails for the same reasons Plaintiffs' misappropriation of a trade secret claim fails." (Def. Summ. J. Mot. 22.) Defendant clarifies in its reply brief that summary judgment must be granted in its favor because Scienton cannot establish misappropriation.    (Def. Summ. J.

Reply 10.)[19]  Defendant is correct that "to succeed on their

misappropriation . . . claim[], [P]laintiffs must establish some

wrongful appropriation or use of the [P]laintiffs' intellectual

property."  Dow Jones & Co. v. Int'l Sec. Exchange, Inc., 451

F.3d 295, 302 (2d Cir. 2006).

Defendant argues that Plaintiffs cannot establish

misappropriation because "the 'unique combination of software

and other products listed in the Trade Secret Disclosure are not

contained in CA's 20/20 or SCC products."  (Def. Summ. J. Mot.

20.)  However, "[i]n order to prove misappropriation, proof of

'slavish copying' is not necessary."  Advanced Analytics, Inc.

v. Citigroup Global Mkts., Inc., No. 04-CV-3531, 2009 WL

7133660, at *19 (S.D.N.Y. Aug. 5, 2009) (report and

recommendation), adopted in part, rejected in part on other

grounds, 2010 WL 4780772 (S.D.N.Y. Nov. 22, 2010).  Rather, a

plaintiff can establish misappropriation "by showing access and

substantial similarity," Julie Research Labs., Inc. v. Select

Photographic Eng'g, Inc., 810 F. Supp. 513, 518 (S.D.N.Y. 1992),

aff'd in part, vacated in part on other grounds, 998 F.2d 65 (2d

Cir. 1993), which shifts the burden to the defendant to

demonstrate independent development, see AEB Assocs. Design

Grp., Inc. v. Tonka Corp., 853 F. Supp. 724, 734 (S.D.N.Y.

---

[19] It appears as though Defendant is not disputing that
Plaintiffs' idea was novel and that there existed a legal
relationship between the parties.

1994); <u>Paul v. Haley</u>, 183 A.D.2d 44, 56, 588 N.Y.S.2d 897, 905 (2d Dep't 1992).

Here, it is undisputed that CA had access to Plaintiffs' "novel" idea to combine previously unrelated computer programs to create a security solution that gathers both physical and digital security-related events, analyzes that data in realtime to identify anomalies/conditions for potential action-taking, and organizes and presents the results of that data.  And there is evidence in the record to suggest that, although 20/20 and SCC did not contain the identical combination of programs listed in Plaintiffs' Trade Secret Disclosure, Defendant's programs are a combination of previously unrelated computer programs that, if used together, achieve the same end-goal as Plaintiffs' ESS.  (<u>See</u> Lawrence Decl. Ex. 96, Myers' Expert Rpt. 44 (describing the "striking similarity in the fundamental target use, purpose, and function set of The Scienton Enterprise Security Solution and Security Command Center"); <u>id.</u> at 25 (finding that there is a "significant amount of overlap" between Scienton's ESS and 20/20).)  Accordingly, summary judgment as to this claim must be denied.

### 3.   Breach of the MNDA

Under New York law, "[t]o establish a <u>prima face</u> case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract;

and (3) damages resulting from the breach." Nat'l Mkt. Share,
Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004).
The parties do not dispute that the MNDA is a valid and
enforceable contract which provides, in part, that CA is barred
from using Plaintiffs' "[d]ocumentation, collateral or any other
written or verbal communications regarding current or future
technology or marketing information for ni-Group's neural
intelligence security management program," without Plaintiffs'
prior written consent. (Walsh Decl. Ex. 5.) Defendant argues
that it is entitled to summary judgment because "Plaintiffs have
failed to demonstrate the actual use of its trade secret in
either 20/20 or SCC." (Def. Summ. J. Mot. 22.) However, the
MNDA covers more than just any alleged trade secret, and, as the
Court explained above, whether CA in fact used Plaintiffs' ESS
in developing 20/20 or SCC is a question of fact necessitating
trial. Accordingly, Defendant's motion for summary judgment
with respect to Plaintiffs' breach of contract claim must be
denied.

### 4. Unfair Competition

"The essence of an unfair competition claim under New
York law is that the defendant misappropriated the fruit of
plaintiff's labors and expenditures by obtaining access to
plaintiff's business idea either through fraud or deception, or
an abuse of a fiduciary or confidential relationship." Telecom

Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (internal quotation marks and citation omitted). Defendant argues that "[t]he lack of misappropriation dooms the unfair competition claim as well" (Def. Summ. J. Reply 10; see also Def. Summ. J. Mot. 22); however, as the Court explained above, whether Defendant misappropriated Plaintiffs' ESS is a material question of fact. Therefore, summary judgment as to the unfair competition claim must also be denied.[20]

II.   Motion to Strike Expert Report and Preclude Testimony

Defendant also moves to preclude the testimony of Plaintiffs' expert, Professor Bayuk, and to strike her expert report.   Professor Bayuk was asked to analyze the depositions and documentary evidence in this case and to opine on the following two issues:   (1) "whether CA could have sold enterprise-wide licenses for security software to CIBC without the know-how and assistance of Scienton," i.e., whether CIBC would have signed the 2001 ELA without Plaintiffs' involvement,

---

[20] Defendant also argues that it is entitled to summary judgment on this claim because Plaintiffs have "never established the claim's requisite bad faith element." (Def. Summ. J. Reply 10.) While Defendant is correct that bad faith is an essential element of an unfair competition claim in New York, see Saratoga Vinchy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980); see also Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 486 (2d Cir. 2005), this argument was raised for the first time in Defendant's reply brief and, as such, will not be considered, see Fairfield Fin. Mortg. Grp., Inc. v. Luca, 584 F. Supp. 2d 479, 486 n.2, 487 n.4 (E.D.N.Y. 2008); Thomas v. Roach, 165 F.3d 137, 145-46 (2d Cir. 1999).

and (2) "whether CA used Scienton's know-how in its Security Command Center product." (Mulry Decl. Ex. 1, Bayuk Rpt. 3.) Given that all of the contract claims have been dismissed, Professor Bayuk's opinions regarding the 2001 ELA are now irrelevant. Thus, to the extent that Defendant's motion seeks to strike those portions of Professor Bayuk's report and to preclude related testimony, the motion is granted.

Although Plaintiffs' claim for misappropriation of a trade secret was dismissed, Professor Bayuk's report does not touch on the existence of a trade secret. Rather, Plaintiffs seek to introduce her testimony to establish that CA had access to Plaintiffs' "know how" and used it to develop SCC. This question--i.e., whether CA misappropriated Plaintiffs' ESS--is relevant to all of the remaining claims, and thus Defendant's motion to strike this portion of Professor Bayuk's report warrants consideration.

The Court will discuss the applicable standard before addressing the admissibility of Professor Bayuk's expert opinion.

A.   Standard of Review

District courts have "broad discretion in admitting expert testimony." Rochester Gas & Elec. Corp. v. GPU, Inc., 355 F. App'x 547, 551 (2d Cir. 2009) (citing Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., L.L.C., 571 F.3d 206, 213

(2d Cir. 2009)); see also Nimely v. City of N.Y., 414 F.3d 381, 395 (2d Cir. 2005) ("It is a well-accepted principle that Rule 702 [of the Federal Rules of Evidence] embodies a liberal standard of admissibility for expert opinions . . . ."). Pursuant to Rule 702 of the Federal Rules of Evidence, a district court can admit expert testimony from an individual "qualified as an expert by knowledge, skill, experience, training, or education" so long as such "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. In addition, the Supreme Court has held that the trial judge has a "special obligation" to ensure that any and all expert testimony "is not only relevant, but reliable." Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). Although the test of reliability is "flexible," id. at 142, and has been liberally construed by courts in this Circuit, see United States v. Brooks, No. 06-CR-0550, 2010 WL 291769, at *2 n.2 (E.D.N.Y. Jan. 11, 2010) (collecting cases), the Second Circuit has warned that the use of expert testimony must be "carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in

applying that law to the facts before it." <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991); <u>see also</u> <u>United States v. Scop</u>, 846 F.2d 135, 139-140 (2d Cir. 1988).

B.    <u>Professor Bayuk's Expert Opinion</u>

Professor Bayuk concludes that "Scienton know-how was used in the development of the CA Security Command Center (SCC) product." (Mulry Decl. Ex. 1, Bayuk Rpt. 45.) Professor Bayuk based her conclusion on her review of the record and her opinion that: (1) "The CIBC sales effort brought Scienton know-how to the attention of CA senior management," (2) "CA management directed their security development team to copy Scienton's approach," and (3) "[t]he set of security features as planned for SCC, in both the marketing and product specifications is based on Scienton's know-how, even though the actual set produced was only a subset of those planned." (Mulry Decl. Ex. 1, Bayuk Rpt. 45.) Defendant argues that "[t]hese opinions are nothing more than Professor Bayuk's view of the factual record that require no specialized expertise," and are "filled with enormous inferences and rank speculation about 'facts' she guesses must have occurred." (Def. Bayuk Mot. 7.) The Court agrees, and for the following reasons, Defendant's motion is granted.

<u>First</u>, Professor Bayuk's report is little more than a factual narrative based on her review of the discovery in this

case (see Mulry Decl. Ex. 1, Bayuk Rpt. App'x A (listing all of the material that she reviewed in forming her conclusion, which consists solely of docket entries in this case, deposition transcripts, and documents produced during the course of discovery)), and courts in this Circuit have consistently precluded similar "factual narrative" expert reports because such testimony "would serve only to usurp the jury in its fact finding role." Member Servs. Inc. v. Sec. Mut. Life Ins. Co. of N.Y., No. 06-CV-1164, 2010 WL 3907489, at *26 (N.D.N.Y. Sept. 30, 2010) (collecting cases). To the extent that such a factual narrative may be relevant, it must be "properly presented through percipient witnesses and documentary evidence"--not through expert testimony. In re Rezulin Prods. Liab., 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2001); see also Media Sport & Arts s.r.l. v. Kinney Shoe Corp., No. 95-CV-3901, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (where expert's "testimony is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties[,] . . . [the expert]'s testimony may not take the place of that of the individuals who actually negotiated the deal"); LinkCo, Inc. v. Fujitsu Ltd., No. 00-CV-7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (finding that "testimony by fact witnesses familiar with those documents would be far more appropriate . . . and renders [the expert witness'] secondhand

knowledge unnecessary for the edification of the jury"
(alterations in original) (internal quotation marks and citation
omitted)); cf. Louis Vuitton Malletier v. Dooney & Bourke, Inc.,
525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) (stating that "a party
cannot call an expert simply as a conduit for introducing
hearsay under the guise that the testifying expert used the
hearsay as the basis of his testimony").

Second, in narrating the facts of this case, Professor
Bayuk often opines on the credibility of witnesses. (See, e.g.,
Stolle Decl. Ex. B, Bayuk Dep. 243-44 (stating that she assumed
that Zivic discussed product functionality with McMahon,
notwithstanding McMahon's testimony that he did not recall
receiving such information from Zivic), id. at 253-54
(discrediting the testimony of Patrick Lee because "[i]t's
inconsistent with [other portions of] his testimony and a
document" in the record).) Such "opinions" regarding witnesses'
credibility are inadmissible. See, e.g., Marvel, 777 F. Supp.
2d at 730 ("Testimony that directs the trier of fact to believe
one account of events over another 'does not assist the trier of
fact, but rather undertakes to tell the jury what result to
reach and attempts to substitute the expert's judgment for the
jury's.'" (quoting Nimely, 414 F.3d at 398)); LinkCo, 2002 WL
1585551, at *2 ("It may (or may not) be true that [s]worn
testimony by key Fujitsu personnel as to who within Fujitsu

actually originated these concepts, technologies, and strategies is unclear and at times contradictory, but this is not a topic for expert testimony." (alteration in original) (internal quotation marks and citation omitted)).

Finally, "a review of the report shows that it does not address technical questions that may be difficult for a juror to comprehend." LinkCo, 2002 WL 1585551, at *2. Plaintiffs assert that they seek to introduce Professor Bayuk's testimony to teach the jury the "technical concepts and terms that are the subject of this case" (Pls. Bayuk Opp. 18) and to apply "those principles to the specific facts of this case" (Pls. Bayuk Opp. 21). Although her report does define some technical terms, nowhere does she state that she was retained for this purpose. Even Magistrate Judge E. Thomas Boyle recognized that Professor Bayuk went "way, way beyond" defining key concepts in her report. (Mulry Decl. Ex. 2, Feb. 23, 2011 Tr. 33.)

Instead, to arrive at her opinion that "Scienton know-how was used in the development of the CA Security Command Center (SCC) product" (Mulry Decl. Ex. 1, Bayuk Rpt. 45), she first attempts to reconstruct CA's organization. Yet she admits she just "approximated" CA's structure based on deposition testimony and documentary evidence. (Mulry Decl. Ex. 1, Bayuk Rpt. Figure 7; id. at 34 ("The table in Figure 7 is not complete

nor exactly what the CA organization structure was at the time.").) Then, she opines that the employees in CA's product strategy group (as labeled on her "approximate" organization chart)--the individuals who met with and were privy to Plaintiffs' know-how--must have shared that information with the employees in CA's product development group (again, as labeled on her chart) who never met Plaintiffs. Yet she admits that she assumed that such conversations occurred based "generally" on "their job function." (Stolle Decl. Ex. B, Bayuk Dep. 229, 232; see also Mulry Decl. Ex. 1, Bayuk Rpt. § 4.2.3 ("Communications . . . can be assumed to have occurred."); id. at 243 ("[T]he very fact that he was in the job function of product strategy means it was his job to influence development. How he did it, I don't know.").) A representative from CA can just as easily be called to testify to the actual structure of CA's development and strategy groups, and the individuals from those groups can be called to testify as to the actual conversations that took place regarding Scienton's know-how. The Court fails to see how Professor Bayuk's connecting-the-dots for the jury is any different than what counsel will do on summation--"propound a particular interpretation of [defendant]'s conduct. This is not justification for the admission of expert testimony." LinkCo, 2002 WL 1585551, at *2. Accordingly, Defendant's motion is GRANTED, Professor Bayuk's

report is stricken, and she is precluded from testifying as to the contents of her report at trial.[21]

CONCLUSION

For the foregoing reasons, CA's motion for summary judgment is GRANTED IN PART and DENIED IN PART and CA's motion to strike Professor Bayuk's report and preclude her testimony is GRANTED.

Given that the motions were filed under seal, the Clerk of the Court is directed to docket this Memorandum and Order under seal and to send copies to counsel for both Plaintiffs and Defendant. The Court will, however, unseal this document and make it available to the public within fourteen (14) days of the date of this Memorandum and Order, unless the parties show good cause in writing before that date why the Court should not do so. Any showing must overcome the

---

[21] Plaintiffs ask that, to the extent that the Court finds that portions of Professor Bayuk's report are not appropriate for expert testimony, her trial testimony be limited to explaining technical concepts that may otherwise confuse the jury rather than precluded in its entirety. However, as the Court noted above, this is not what her report sets out to do, and it is unclear what, if anything, would remain if the inadmissible portions of the report were stricken. Judge Boyle gave Plaintiffs the opportunity to have Professor Bayuk revise her report to "distill" it to areas that are "not over the line" and warned that failure to do so could result in their "losing the whole report." (Mulry Decl. Ex. 2, Feb. 23, 2011 Tr. 38.) Plaintiffs did not heed Judge Boyle's warning, and the Court will not now, at this late stage, permit Professor Bayuk to submit a revised report.

presumption that court documents are generally open to the public.

                                SO ORDERED.

                                /s/ JOANNA SEYBERT_____
                                Joanna Seybert, U.S.D.J.


Dated:     September   25  , 2012
           Central Islip, NY